# United States District Court
# District of Massachusetts

EIQNETWORKS, INC.,
      Plaintiff,

    V.                   CIVIL ACTION NO. 2009-11350-RBC

BHI ADVANCED INTERNET
    SOLUTIONS, INC.,
      Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, IN THE ALTERNATIVE, TO TRANSFER (#19)

COLLINGS, U.S.M.J.

### I.  Introduction

On August 12, 2009, plaintiff eIQnetworks, Inc. ("EIQ") filed a four-count

complaint (#1) against defendant BHI Advanced Internet Solutions, Inc.,

("BHI").  Specifically, the plaintiff alleges a breach of contract/default in

payment claim in Count I, a breach of contract/anticipatory repudiation claim

in Count II, a breach of the covenant of good faith and fair dealing claim in Count III, and an unjust enrichment/quantum meruit claim in Count IV.  On October 13, 2009, BHI filed an answer (#7) to the complaint together with a nine-count counterclaim alleging claims for breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); unjust enrichment (Count III); intentional or negligent misrepresentation (Count IV); fraud (Count V); promissory estoppel (Count VI); violation of Mass. Gen. L. c. 93A (Count VII); breach of express warranty, Mass. Gen. L. c. 106, § 2-313 (Count VIII); and breach of the implied warranty of fitness for a particular purpose, Mass. Gen. L. c. 106 § 2-315.  EIQ duly filed an answer to the counterclaim on November 2, 2009. (#9)

On March 1, 2010, BHI filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer (#19) along with a memorandum (#20) in support and a declaration (#21) with exhibits. EIQ filed an opposition (#23) to the dispositive motion and a declaration (#24) with exhibits on March 19, 2010.  Ten days later BHI filed a reply brief (#27) and, with leave having been granted, the plaintiff filed a sur-reply (#29) on April 29, 2010.  With the record complete, the motion to dismiss is poised for resolution.

## II. The Facts

2

EIQ is a Massachusetts corporation engaged in the business of security and compliance management software. (#1 ¶¶ 1-2)   BHI is a Minnesota corporation "that provides secure, high-performance Internet hosting and security services" including "a package of services" called "SecureConnect®" which "is a comprehensive, turn-key solution to help companies comply with Payment Card Industry ("PCI") Data Security Standards ("DSS"). (Declaration of David Perrill #21 ¶ 21[1])

On or about June 21, 2005, Julie Wisnewski (Wisnewski") of EIQ contacted David Price ("Price") of BHI after Price participated in a webinar about EIQ's software. (Declaration of Michael Sullivan #24 ¶ 4)  About a week later on June 30, 2005, Wisnewski called Price to follow up on BHI's potential interest in EIQ's software, at which time Price indicated that he did not then have time to evaluate EIQ's product. (#24 ¶ 5)  In another follow-up telephone call initiated by Wisnewski on August 5, 2005, Price advised that BHI was not currently evaluating any software and suggested Wisnewski call him back in September. (#24 ¶ 6) On October 19, 2005, Wisnewski called Price again and

---

[1]

According to Perrill, the President of BHI, "PCI DSS standards refers to a set of comprehensive standards adopted by the credit card industry to ensure the security of credit card transactions, both for Internet-based transactions and physical storage transactions." (#21 ¶ 3)

was told that BHI was not then interested in EIQ's software. (#24 ¶ 7)

On February 16, 2006, David Glenn ("Glenn") of EIQ called Price to follow up on Wisnewski's previous contacts, but was advised that BHI would not be looking at the software until early the next year. (#24 ¶ 8)   The following day, February 17, 2006, Helena Antilla ("Antilla") of EIQ sent an e-mail to Price about other of EIQ's software offerings. (#24 ¶ 9)  Antilla again communicated with Price on March 6, 2006 in an attempt to discuss EIQ's software with him. (#24 ¶ 10)

On August 8, 2007, the Vice President of Field Operations at EIQ sent an unsolicited e-mail to David Price at BHI promoting EIQ's software and requesting that BHI contact him to explore the creation of "a mutually beneficial partnership." (#21 ¶ 6 and Exh. 1)  BHI did not respond to the e-mail. (#21 ¶ 6)  BHI received another e-mail from EIQ on October 9, 2007, to which it did not reply. (#21 ¶ 7)

EIQ's Regional Sales Manager, Paul Mayo ("Mayo"), sent an e-mail to BHI's sales department on January 15, 2008, requesting "to schedule an introductory call with the most appropriate people about partnering with your company." (#21 ¶ 8 and Exh. 4)

In early May of 2008 Phil DeMeo ("DeMeo"), a Senior Account Manager

at EIQ, had a telephone conversation with Eric Humphries ("Humphries") at BHI about EIQ's products. (#24 ¶ 11)  DeMeo followed up this telephone call with an e-mail to Humphries on May 13, 2008. (#24 ¶ 12)  On June 3, 2008, DeMeo sent Humphries an e-mail with a quote attached. (#24 ¶ 13)

Two weeks later on June 17, 2008, Mayo from EIQ had a telephone conversation with Perrill of BHI to discuss a potential sale of EIQ's software. (#24 ¶ 14)  In response to BHI's questions about EIQ's warranty, on June 18, 2008, Mayo e-mailed Perrill and Humphries certain information. (#24 ¶ 15) EIQ representatives John Linkous ("Linkous") and Mayo held a one-hour conference call with BHI's Perrill and Humphries on June 25, 2008, to discuss EIQ's software products and PCI DSS compliance. (#24 ¶ 16)

On June 30, 2008, BHI's Perrill e-mailed EIQ's Mayo asking that EIQ's 90-day warranty which Perrill had apparently requested during the June 25th conference call be changed to a 90-day money back guarantee. (#24 ¶ 17) That same day Mayo responded to Perrill, stating that EIQ would not give a money back guarantee. (#24 ¶ 18)  In turn on June 30th Perrill sent DeMeo by fax a signed copy of the price quote to purchase EIQ's software with the provision that "[t]his agreement is signed per the terms set in e-mails dated 6/30/2008 from Paul Mayo." (#21 ¶ 10; #24 ¶¶ 19, 21 and Exh. E)

On July 1, 2008, the "Orders" department at EIQ sent Perrill an e-mail notifying him that BHI's order for the software had been placed. (#24 ¶ 22) Upon receiving an e-mail invoice attachment from EIQ on July 7, 2008, Perrill e-mailed Mayo to have the invoice redone to reflect "the updated pay schedule." (#21 ¶ 11; #24 ¶ 23 and Exh. G)  On July 20, 2008, Perrill signed a credit card processing authorization on behalf of BHI authorizing EIQ to charge $7,000 to BHI's credit card; Perrill e-mailed the authorization back to EIQ. (#21 ¶ 12; #24 ¶ 25)

Mayo of EIQ e-mailed Perrill at BHI on July 30, 2008 to remind him that it was the last date on which the order for EIQ software could be cancelled. (#24 ¶ 28)  On even date, Perrill responded to Mayo by e-mail, stating that he thought "all was well" and "we're excited to do business." (#24 ¶ 29)  Mayo replied that same day, thanking Perrill for his confirmation (#25 ¶ 27) to which Perrill responded by return e-mail on July 31, 2008. (#24 ¶ 26)[2]

Between October 14, 2008 and January 5, 2009, BHI contacted EIQ eight times seeking technical support to which EIQ responded. (#21 ¶ 13; #24 ¶¶ 31-

---

[2]      There was another email in this July 30, 2008 series from Humphries at BHI to a Ron Collins at EIQ, cc'd to Mayo, in which Humphries praised the work of Collins in solving a software problem. (#25 ¶ 30)

6

42[3])  EIQ's Mayo contacted BHI's Perrill in January, 2009 when BHI's credit card was rejected for payment, and Perrill responded by e-mail that EIQ should forward an invoice and BHI would pay by check. (#24 ¶¶ 43-46)  On February 5, 2009, BHI contacted EIQ via its technical support line for help. (#24 ¶ 47)

When Mayo e-mailed Perrill on May 5, 2009 regarding a late payment, Perrill e-mailed back on May 11, 2009 to set up a conference call. (#24 ¶¶ 49, 50)  During the May 13, 2009 telephone call between Mayo and Perrill, Perrill stated that EIQ's product did not work and that BHI had moved on and no longer used it. (#24 ¶ 51)   Perrill responded to an EIQ e-mail requesting information on May 20, 2009. (#24 ¶¶ 52-3)

BHI is a Minnesota corporation with a principal place of business in Minnesota. (#1 ¶ 3; #7 ¶ 3)  BHI is not registered to do business nor does it have a registered agent in the Commonwealth. (#21 ¶ 16)  BHI has no offices, telephones or bank accounts in Massachusetts. (#21 ¶ 16)  The BHI website is a passive site that provides information about BHI's products and services, but does not sell them; it is available to internet users worldwide and does not

---

[3]

These contacts can be grouped together.  For example, four BHI to EIQ contacts on November 6 and 7, 2008, were part of a back-and-forth communication related to scheduling a conference call to discuss problems. (#25 ¶¶ 36-41)

target any particular state such as Massachusetts.[4] (#21 ¶ 18)  BHI does not solicit customers in the Commonwealth and it does not advertise specifically in Massachusetts although, as noted, its website is available worldwide. (#21 ¶ 20)  In his declaration, Perrill states that "[a]t no time did BHI employees travel to Massachusetts in connection with the negotiation or purchase of the eIQ software or in connection with BHI's efforts to get eIQ to provide the functionality that it had promised to BHI." (#21 ¶ 15)

BHI does have four customers in Massachusetts: "[t]hree are local franchisees of YUM! Brands (parent of KFC/A&W Root Beer and Taco Bell), and the fourth is Emmanuel College." (#21 ¶ 20)  BHI provides services remotely to these clients over the Internet from Minnesota, basically scanning their computers for security vulnerabilities, security maintenance services, etc. (#21 ¶ 20)  In total BHI receives less than two hundred dollars monthly from these four clients as recurring revenue for services provided. (#21 ¶ 20)

### III. The Legal Standard

EIQ bears the burden of proving that BHI is subject to the jurisdiction of

---

[4]
    BHI maintains a second website that provides information about its SecureConnect® product. (#21 ¶ 19)  During the relevant time period there was minimal interactivity available through this website; a potential client's name, contact information and other requirements could be inputted and BHI would respond by telephone or e-mail to discuss the client's needs and the capabilities of BHI's product. (#21 ¶ 19)

Massachusetts courts. *Adams v. Adams*, 601 F.3d 1, 4 (1 Cir., 2010); *Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1, 8 (1 Cir., 2009); *Massachusetts School of Law at Andover, Inc. v. American Bar Association*, 142 F.3d 26, 34 (1 Cir., 1998). To meet this burden it must be shown that the defendant is subject to jurisdiction under the Massachusetts long-arm statute, Mass. Gen. L. c. 223A, and under the strictures of constitutional due process.[5] *Harlow v. Children's Hospital*, 432 F.3d 50, 57 (1 Cir., 2005); *Noonan v. Winston Co.*, 135 F.3d 85, 89 (1 Cir., 1998). When no evidentiary hearing is held, as in this case, a *prima facie* standard applies. *Adelson v. Hananel*, 510 F.3d 43, 48 (1 Cir., 2007); *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (1 Cir., 2001). In order to meet its burden under this standard, it is incumbent upon the plaintiff "to demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the Constitution." *Negron-Torres v. Verizon Communications, Inc.*, 478 F.3d 19, 24 (1 Cir., 2007) (internal quotations and citation omitted). When evaluating whether the *prima facie* standard has been met, the Court "accepts properly supported proffers of

---

[5]

      EIQ's argument is based on specific jurisdiction which "exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum based activities." *Massachusetts School of Law*, 142 F.3d at 34 (citation omitted); *United Elec. Radio and Machine Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-89 (1 Cir., 1992).

evidence by a plaintiff as true[6] and makes its ruling as a matter of law." *Swiss American Bank, Ltd.,* 274 F.3d at 619 (internal quotations and citation omitted); *Astro-Med, Inc.,* 591 F.3d at 8; *Adelson,* 510 F.3d at 48 ("Under this standard, the court need only consider...whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." (internal quotation and citations omitted); *Harlow,* 432 F.3d at 57.

## IV. Discussion
### A. The Long-Arm Statute

The Massachusetts long-arm statute provides in pertinent part that:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth....

Mass. Gen. L. c. 223A, §3(a).

In order to have jurisdiction under this subsection, (1) the defendant must have transacted business in Massachusetts, and (2) the plaintiff's claim must have arisen from the defendant's transaction of such business. *Roberts v. Legendary Marine Sales,* 447 Mass. 860, 863, 857 N.E.2d 1089, 1091 (2006) (citing *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767, 625 N.E.2d 549 (1994)); *Nowak v. Tak*

---

[6]    Any uncontradicted facts presented by the defendant are also considered. *See Massachusetts School of Law,* 142 F.3d at 34 (citation omitted).

*How Investments, Ltd.*, 94 F.3d 708, 712 (1 Cir., 1996), *cert. denied*, 520 U.S. 1155 (1997); *M-R Logistics, LLC v. Riverside Rail, LLC*, 537 F. Supp.2d 269, 275 (D. Mass., 2008).

The "transacting any business" clause in §3(a) has been construed "in a generous manner." *United Elec., Radio and Mach. Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1087 (1 Cir., 1992)(citing *Hahn v. Vermont Law School*, 698 F.2d 48, 50 (1 Cir., 1983)); *Nova Biomedical Corp. v. Moller,* 629 F.2d 190, 193 (1 Cir., 1980); *Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co.,* 26 Mass. App. Ct. 14, 17, 522 N.E.2d 989, 991, *rev. denied,* 402 Mass. 1105, 525 N.E.2d 678 (1988) (Table).   "A defendant's physical presence in the Commonwealth is not necessary to 'transact business' in Massachusetts, rather it is the defendant's 'attempt to participate in the Commonwealth's economic life' that counts." *BCCTC Associates, Inc. v. Summerdale/AAHFI, L.P.*, 656 F. Supp.2d 208, 215 (D. Mass., 2009)(quoting *United Elec., Radio and Mach., Workers of America*, 960 F.2d at 1087).   In some instances rather minimal or isolated communications into Massachusetts have been found to be sufficient under the long-arm statute. *See, e.g.,  Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 931 (1 Cir., 1985)(defendant

mailed four letters to plaintiff in Massachusetts and received at least one telephone call from the plaintiff while negotiating a guaranty); *Hahn*, 698 F.2d at 50-1 (defendant sent plaintiff application information in Massachusetts and then mailed an offer of acceptance to the Commonwealth); *Nova Biomedical Corp.*, 629 F.2d 194-5 (defendant mailed two cease-and-desist letters in which litigation was threatened to plaintiff in Massachusetts). That having been said,

> It is not true, however, that *any* contractual communication into Massachusetts is sufficient to establish personal jurisdiction. In the typical case, the focus is on the contacts relating to the formation of the contract; those contacts ordinarily must be instrumental to its formation to establish jurisdiction. Thus, in the case of a typical bilateral contract and a "passive" purchaser, letters and phone calls into a forum that may accompany an order "are viewed as ancillary activity without substantial commercial consequence in the forum." *Little, Brown and Co. (Inc.) v. Bourne,* 493 F. Supp. 544, 547 (D. Mass.1980); *cf. Good Hope Industries, Inc. v. Ryder Scott Co.,* 378 Mass. 1, 10-11, 389 N.E.2d 76 (1979).[FN3]

> FN3. *See Lyle Richards Intern., Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 112-114 (1st Cir.1997) (post-contract telephone calls two or three times a week regarding ongoing contract performance does not confer personal jurisdiction); *Harlow v. Children's Hospital,* 432 F.3d 50, 62 (1st Cir.2005) ("Because causation is central to the relatedness inquiry ... *in most cases,* contacts coming into existence after the cause of action arose

will not be relevant")(internal citation omitted) (emphasis added); *Massachusetts School of Law,* 142 F.3d at 35 ("... if a contract claim, our stereotypical inquiry *tends* to ask whether the defendant's forum-based activities are 'instrumental in the formation of the contract'")(emphasis added); *Champion Exposition Services v. Hi-Tech Elec.,* 273 F. Supp.2d 172, 176-177 (D. Mass. 2003) (distinguishing *Lyle Richards* and finding personal jurisdiction on ground that pre-execution contacts were instrumental in the formation of the contract); *Workgroup Technology Corp. v. MGM Grand Hotel, LLC,* 246 F. Supp.2d 102, 111-112 (D. Mass. 2003) (distinguishing *Lyle Richards* because Massachusetts contacts crucial to the formation of the contract in dispute); *Aub v. Technicolor Entertainment Services,* 224 F. Supp.2d 371, 374 (D. Mass. 2002)(repeated mail and telephone communication to Massachusetts are 'isolated and fortuitous' and do not establish personal jurisdiction when consulting contract executed in California and plaintiff subsequently moved to Massachusetts). *Contra Halchak Corp., Inc. v. Symbiot Business Group, Inc.,* 516 F. Supp.2d 149, 152 (D. Mass. 2007)('The mailing of one check to [plaintiff] under the [contract] does, however, constitute a business transaction in Massachusetts and is enough to confer personal jurisdiction on this court').

*M-R Logistics*, 537 F. Supp.2d at 275.

In this case it is the plaintiff, EIQ, that repeatedly contacted BHI, i.e., on about sixteen occasions beginning in June, 2005 and continuing through June of 2008, sending information and proposals in order to solicit the defendant's business.  The first communication apparently initiated by BHI was a June 30,

13

2008 e-mail following up a request made during a June 25, 2008 conference call that a 90-day warranty be converted to a 90-day money back guarantee. That same day, after EIQ's response that money back guarantees were not given, BHI faxed a signed a copy of a previously received price quote to purchase EIQ's software with the proviso that "[t]his agreement is signed per the terms set out in e-mails dated 6/30/2008 from Paul Mayo."[7] (#21 ¶ 10; #24 ¶¶ 19, 21 and Exh. B)  In return, EIQ e-mailed the software to BHI.

As BHI argues, in this case it was clearly the Massachusetts company that repeatedly reached out to the Minnesota company, actively pursuing the defendant's business.[8]  That factor alone, however, is not the sole consideration. It is undisputed that BHI engaged in telephone calls with EIQ in Massachusetts and did send e-mail and fax communications into the Commonwealth,

---

[7]

It appears that at some point there was an agreement reached between the parties that adjusted the amounts due on the twelve contract payments.  While the total cost remained the same, i.e., $104,383.80, instead of that sum being paid in twelve equal installments of $8,698.65 over the thirty-six month contract period, the payment amounts were graduated over time, starting at $7,000.00 and eventually reaching $9,500.00. *Compare* #21, Exh. 8 with #21, Exh. 9.

[8]

In its reply brief, BHI argues that the Court should recognize that EIQ, the Massachusetts entity, sold software to the defendant, not vice versa.  While it may be true that in applying the "transacting business" section of the Massachusetts long-arm statute courts have recognized the purchaser/seller distinction as not to "discourag[e] foreign purchasers from dealing with resident sellers for fear of having to engage in litigation in distant courts," *Good Hope Industries, Inc. v. Ryder Scott Co.*, 378 Mass. 1, 9 n.14, 389 N.E.2d 76, 81 n. 14 (1979), the nature of the defendants' contacts with the forum in those cases differ from the ones at hand. *See*, e.g., *New Hampshire Ins. Guar. Ass'n v. Markem Corp.*, 424 Mass. 344, 349, 676 N.E.2d 809, 812 (1997).

including the signed price quote which served to close the deal.  But what is perhaps most significant here is that the defendant negotiated unique terms in its contract with the plaintiff.

According to Michael Sullivan, the Chief Financial Officer of EIQ, the agreement between the plaintiff and BHI was not *pro forma* or boilerplate.  To the contrary, as a result of the negotiations between the parties, "[t]he contract now included a 30-day trial period of EIQ's software and the right to cancel the contract at the end of those 30 days." (#24 ¶ 20)  In addition, as noted earlier, the pricing terms deviated from EIQ's standard contractual provisions. (#21, Exh. 8 and 9)  As is evident from BHI's notation when signing the price quote, to wit, "[t]his agreement is signed per the terms set out in e-mails dated 6/30/2008 from Paul Mayo," these unique terms were essential to the formation of the contract.  Indeed, upon receiving the first standard payment invoice by e-mail from EIQ on July 7, 2008, Perrill contacted Mayo to have that invoice corrected to reflect the different, lesser payment amount that had been negotiated by the parties. (#21 ¶ 11; #24 ¶ 23 and Exh. G)  These negotiated changes belie BHI's claim of being merely a passive purchaser[9]; the defendant

---

[9] The "wholly passive purchaser" has been described as one "'who do[es] no more than place an order with an out of state merchant and await[s] delivery.'" *L&P Converters, Inc. v. H.M.S. Direct Mail Serv., Inc.*,

was an active participant in a negotiation process to have standard contract terms altered for its own benefit. BHI's contacts with the Commonwealth, i.e., telephone negotiations, e-mails and faxes, were vital to the consummation of the software contract at the heart of this litigation and so are sufficient to support the conclusion that the defendant transacted business in Massachusetts within the meaning of the long-arm statute. *See,* e.g., *Workgroup Technology,* 246 F. Supp.2d at 109-113; *cf. Lyle Richards Intern., Ltd. v. Ashworth,* Inc., 132 F.3d 111, 112-114 (1 Cir., 1997) ("purely incidental" as opposed to "deliberate" contacts with the Commonwealth insufficient basis upon which to exercise jurisdiction).

EIQ has also established that its claims against the defendant arise out of BHI's transaction of business in Massachusetts. As the First Circuit has explained:

> The 'arising from' clause in chapter 223A is to be generously construed in favor of asserting personal jurisdiction, by applying the following 'but for' causation test: Did the defendant's contacts with the Commonwealth constitute 'the first step in a train of events that result[ed] in the personal injury.' *Tatro [v. Manor Care, Inc.,* 416 Mass. 763, 770,] 625 N.E.2d [549] at 553 [(1994)].

---

634 F. Supp. 365, 366 (D. Mass., 1986)(quoting *Bond Leather Co.,* 764 F. 2d at 933 (further citations omitted)).

16

*Lyle Richards*, 132 F.3d at 114; *Workgroup Technology*, 246 F. Supp.2d at 112. BHI's contacts with the Commonwealth were crucial in the formation and execution of the software contract between the parties, the alleged breach of which is the foundation of the plaintiff's claims.   Put another way, the agreement between EIQ and BHI would not have come to fruition "but for" the telephonic negotiations, e-mails and faxes between the parties in Massachusetts.

In sum, EIQ has meet its burden of proving that the requirements of Mass. Gen. L. c. 223 §3(a) have been met.

<u>B. The Due Process Analysis</u>

The Due Process Clause of the Constitution mandates that in order properly to exercise personal jurisdiction over BHI, a foreign defendant, in the Commonwealth, BHI must have adequate minimum contacts with Massachusetts so that maintenance of the suit here will not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (quotation omitted).  As recently set forth by the First Circuit,

> we have broken the minimum contacts analysis into three categories -relatedness, purposeful availment, and reasonableness:
>
>> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendants involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Adams*, 601 F.3d at 5 (quoting *Adelson*, 510 F.3d at 49); *Sawtelle v. Farrell*, 70 F.3d 1381, 1388-89 (1 Cir., 1995).

18

*i. Relatedness*

"The relatedness prong ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *Swiss American Bank, Ltd.*, 274 F.3d at 623 (citations omitted).  The inquiry under this factor is "whether the defendant's activity in the forum state was instrumental either in the formation of the contract or its breach." *Adams*, 601 F.3d at 6 (internal quotations and citations omitted).  "A contract, by itself, cannot automatically establish minimum contacts...prior negotiations and contemplated future consequences, along with...the parties' actual course of dealings...must be evaluated in determining whether the defendant has minimum contacts with the forum." *Swiss American Bank*, *Ltd.*, 274 F.3d at 621 (quotations and citations omitted).  A "flexible, relaxed standard," *Pritzker v. Yari*, 42 F.3d 53, 61 (1 Cir., 1994), *cert. denied*, 514 U.S. 1108 (1995), which is functionally equivalent to that under the long-arm statute is to be applied. *M-R Logistics*, 537 F. Supp.2d at 277 & n. 6.

As has been discussed, BHI's contacts with EIQ in Massachusetts via telephone, e-mail and fax to negotiate the terms of the software agreement and

which were, in fact, instrumental in reaching the contract that is now in dispute, fulfill the relatedness inquiry. Moreover, after the agreement had been reached, the parties continued to communicate both with respect to payments and with regard to technical support. (#21 ¶ 13; #24 ¶¶ 31-47[10]) BHI's failure to make payments to EIQ in Massachusetts, of course, constitutes the very conduct upon which the breach of contract claim is premised.

Overall, BHI's contacts with EIQ in Massachusetts with respect to the negotiation and implementation of the software contract were more than minimal. It does not contravene fundamental fairness to require BHI to defend EIQ's claims in this forum.

## ii. Purposeful Availment

"The purposeful availment inquiry...focuses on the defendant's intentionality." *Swiss American Bank, Ltd.*, 274 F.3d at 623 (citation omitted). According to the First Circuit:

> To satisfy the second requirement, 'the

---

[10]

These contacts for technical support are not necessarily of the same nature as the expected or anticipated post-contract communication discussed in *M-R Logistics* or *Little, Brown & Co. v. Bourne*, 493 F. Supp. 544 (D. Mass, 1980). That having been said, it likely should have been anticipated that there would be future communication between the parties at least during the three-month trial period given that the product sold by the plaintiff was specialized computer software that was to be integrated into the defendant's computer system.

> defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendants involuntary presence before the state's courts foreseeable.' *N. Laminate Sales [, Inc. v. Davis]*, 403 F.3d [14] at 25 [(1 Cir., 2005)] (quoting *United Elec. Workers [v. 163 Pleasant St. Corp.]*, 960 F.2d [1080] at 1089 [(1 Cir., 1992)]). The focus is on 'voluntariness and foreseeability.' *Id.* (quoting *Sawtelle v. Farrell,* 70 F.3d 1381, 1391 (1st Cir.1995)).

*Astro-Med, Inc.*, 591 F.3d at 10.

BHI knew that it was dealing with a Massachusetts corporation; both e-mails and the invoice signed by Perrill to purchase the software reflect EIQ's address as being in Acton, Massachusetts. (#21 ¶ 10; #24 ¶¶ 19, 21 and Exh. E)  The defendant chose to purchase from EIQ after evaluating software products from various companies.  BHI actively negotiated with EIQ in order to obtain contract terms that were beneficial to it.  The defendant entered a contract on June 30, 2008 which called for payments to be made to EIQ in Massachusetts over a period of eighteen months; BHI stopped making payments during the first half of 2009.  In light of all the facts and circumstances of this case, BHI clearly intended to do business and availed itself of the privilege of actually conducting business in Massachusetts.  Moreover, it was foreseeable that the defendant

could end up in a Massachusetts courtroom in case of a breach of its contract with EIQ.

*iii. Reasonableness*

The final consideration in the constitutional analysis is whether the exercise of jurisdiction over BHI would be reasonable.  Certain "gestalt factors" are to be weighed in making this reasonableness determination, including:

> the defendant's burden of appearing, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and the shared interest of the several States in furthering fundamental substantive social policies. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *N. Laminate Sales [, Inc. v. Davis],* 403 F.3d [14] at 26 [(1 Cir., 2005)].

*Astro-Med, Inc.*, 591 F.3d at 10-11.

Being located in Minnesota with no offices in Massachusetts, it is fair to assume that it would be a burden for BHI to defend in this forum.  Then, again, the same could be said for nearly all foreign defendants. *Nowak,* 94 F.3d at 718 ("This Court has recognized, however, that it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction.") (citation omitted). The

First Circuit has determined that "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker*, 42 F.3d at 64 (citation omitted).  BHI has made no such showing here.[11]

Since EIQ is a Massachusetts corporation, the Commonwealth undoubtedly has an interest in adjudicating a case involving this Massachusetts business.  Moreover, EIQ's "choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395.  There has been no suggestion made by BHI that Minnesota has a greater interest in resolving this contract action than Massachusetts, or that its home state could provide a more efficient resolution to the dispute.  Finally, social policy considerations are not relevant in the present context.

To summarize, the gestalt factors either weigh in EIQ's favor, or they are neutral.  The exercise of personal jurisdiction over BHI in Massachusetts therefore accords with the strictures of due process and will not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.*, 326 U.S. at 316 (1945)(quotation omitted).

---

[11]

The defendant argues that "BHI and all of its employees and consultants responsible for trying to implement eIQ software are located in Minnesota." (#20 at 17)  This is not a unique or special circumstance for a foreign defendant.

## *V. Conclusion*

Both the state statutory and the constitutional requirements for the exercise of personal jurisdiction have been met in this case. Accordingly, for all of the reasons stated, it is ORDERED that Defendant's Motion To Dismiss For Lack Of Personal Jurisdiction Or, In The Alternative, To Transfer (#19) be, and the same hereby is, DENIED.

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

July 29, 2010.